## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| STEVE WALTER, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:21-CV-01559-G-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act should be **AFFIRMED**.

### I.    BACKGROUND

On October 5, 2016, Steve Walter (Plaintiff) filed his application for DIB, alleging disability beginning April 2, 2016. (doc. 9-1 at 310.)[2] His claim was denied initially on December 19, 2016, and upon reconsideration on May 1, 2017. (*Id.* at 164, 169.) After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified at a hearing on April 19, 2018. (*Id.* at 95-113, 173-74.) On June 14, 2018, the ALJ issued a decision finding Plaintiff had not been disabled from April 2, 2016, through the date of his decision. (*Id.* at 150-51.) Plaintiff timely appealed to the Appeals Council, which vacated the ALJ's decision and remanded the case for further proceedings on December 3, 2019. (*Id.* at 158-59, 225-26.)

On September 1, 2020, Plaintiff appeared and testified at a supplemental hearing, which

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

was held by telephone due to the "public health emergency" presented by the coronavirus pandemic, before a different ALJ. (*Id.* at 47-62.) On October 29, 2020, the ALJ issued a decision finding Plaintiff not disabled. (*Id.* at 16-28.) Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 28, 2020. (*Id.* at 307-09.) The Appeals Council denied his request for review on April 29, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6-9.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

## A.  Age, Education, and Work Experience

Plaintiff was born on November 14, 1967; he was 48 years old at the time of the alleged onset date. (doc. 9-1 at 26, 96.) He had a high school education, could communicate in English, and had past relevant work as a meat department manager. (*Id.* at 97-98, 344, 346, 373.)

## B.  Medical, Psychological, and Psychiatric Evidence

On April 6, 2016, Plaintiff presented to an occupational therapist clinic, Rehab Management (OT Clinic), for an initial physical therapy examination. (*Id.* at 584-87, 762-65.) He complained of pain, numbness, and tingling in his neck and numbness in his left upper extremity. (*Id.* at 584.) He had been on 5-weeks' release from work, where he stocked items and walked "a lot" for 7 hours a day 6 days per week. (*Id.*) He was in significant pain, which caused him to lie down after work. (*Id.*) He had decreased cervical range of motion, increased postural muscular tightness, 4+/5 to 5/5 muscle strength, and grossly intact cranial nerves; he reported not taking any medications because in the past they had "masked" the pain and resulted in multi-level disc bulges in his neck. (*Id.* at 584-85.) He was diagnosed with spondylosis and radiculopathy of the cervical spine (C-spine) and lumbar spine (L-spine), muscle weakness, "other specific joint derangements of unspecified joint, not elsewhere classified", "other lack of coordination", and "abnormal posture". (*Id.* at 584.) A 6-week treatment plan was recommended, with "good" potential for

rehabilitation. (*Id.* at 587.)

Two weeks later, on April 20, 2016, Plaintiff returned to OT Clinic; he agreed to physical therapy intervention and reported reduction in pain since becoming less "mobile". (*Id.* at 572-73.) He demonstrated good tolerance to new therapy exercises but reported increased pain and difficulty on the right side. (*Id.* at 573.) He had decreased tenderness and tightness in the cervical paraspinals and increased tightness and tenderness in the distal lateral aspect of upper trapezius. (*Id.*) He was advised to continue manual therapy to reduce tissue tension and pain. (*Id.*)

Between April 22, 2016, and May 20, 2016, Plaintiff presented to OT Clinic for 11 physical therapy sessions. (*Id.* at 550-71.) He reported pain, soreness, numbness, tightness, weakness, and/or limited range of motion in the neck, left arm, left shoulder, left sternocleidosmastoid (SCM) muscle, and upper back, secondary to pain and left rotation of the C-spine. (*Id.* at 553, 564, 566, 568-69.) On April 29, 2016, he complained of 5/10 pain "constantly" and 7/10 pain "sometimes". (*Id.* at 566.) On May 18, 2016, he complained of 5/10 pain in left shoulder, 4/10 pain in bilateral shoulders, and a "burning" sensation with pain into left quad; the left SCM muscle and trapezius continued to cause the "most" pain. (*Id.* at 552, 554, 557, 559.) Plaintiff also reported increased mobility, decreased pain and increased range of motion of the C-spine and neck post manual therapy, and less frequent but equally intense numbness and tingling in left arm and left leg. (*Id.* at 553, 562, 567, 570.) Because he presented with "poor" postural alignment and pain during left rotation of the C-spine despite some progress, he was advised to continue physical therapy for musculoskeletal coordination, postural awareness, and functional mobility. (*Id.* at 553, 559, 562.) The diagnosis remained the same as on April 6, 2016. (*Id.* at 550-71.)

On June 3, 2016, a magnetic resonance imaging (MRI) of the L-spine revealed mild to moderate degenerative changes and minimal posterior annular bulging at L3-L4, as well as mild

degenerative disc changes with a posterior annular tear and a mild broad-based disc protrusion, but no evidence of spinal stenosis or neural impingement at L4-5. (*Id.* at 650-51.) It also revealed mild/moderate degenerative disc changes with a small broad-based disc protrusion, most pronounced midline and to the right, with minimal thecal sac indentation, and no evidence of spinal stenosis or neural impingement at L5-S1. (*Id.*)

On June 6, 2016, Plaintiff visited Texas Back Institute and presented to Renato Bosita, M.D. (Back Doctor), for an MRI follow-up. (*Id.* at 647-48.) Plaintiff had 5/5 bilateral upper and lower extremity strength, negative Hoffmann sign[3], and no hyperreflexia or clonus. (*Id.* at 648.) He was diagnosed with cervical radiculitis, cervical spondylosis without myelopathy, and back pain, lumbar, with radiculopathy. (*Id.*)

On June 15, 2016, a computed tomography (CT) scan of the C-spine revealed solid fusion at C5-C6, a "questionable"[4] fusion at C6-C7, and mild to moderate spondylosis within the mid to lower C-spine. (*Id.* at 645-46.)

On June 20, 2016, Plaintiff returned to Back Doctor for a CT scan follow-up. (*Id.* at 1043.) He had 5/5 strength in the bilateral upper and lower extremities and was not using an assistive device. (*Id.*) The CT scan revealed "nonunion without hardware failure"[5] and solid fusion at C5-

---

[3] "The Hoffmann sign is commonly used physical examination maneuver, taught to be an indicator of upper motor neuron dysfunction and is attributed to a 19th century German neurologist, Johann Hoffmann." Alexandra Fogarty, MD, et al., *A Systematic Review of the Utility of the Hoffmann Sign for the Diagnosis of Degenerative Cervical Myelopathy*, 43(23) Spine 1664-69 (2018); *see also Hoffmann sign*, Stedmans Medical Dictionary (2014) (defining "Hoffmann sign" as "(1) in latent tetany mild mechanical stimulation of the trigeminal nerve causes severe pain; (2) flexion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked").

[4] Questionable means "minimal sign of instability". Francesco Costa, et al., *Instrumented fusion surgery in elderly patients (over 75 years old): clinical and radiological results in a series of 53 patients*, NIH.gov (Nov. 2013), www.ncbi.nlm.nih.gov/pmc/articles/PMC3830041.

[5] "Metal screws and plates used to stabilize the spine are called 'hardware.' The hardware may move or break before the bones are completely fused. If this occurs, a second surgery may be needed to fix or replace the hardware." *Anterior Cervical Discectomy & Fusion (ACDF)*, MayfieldClinic.com, https://mayfieldclinic.com/pe-

6. (*Id.*) Revision "anterior cervical discectomy and fusion surgery" (Fusion Surgery) at C6-7 with autograft was recommended; he was also prescribed Cyclobenzaprine and Norco, and assessed with lumbar back pain with radiculopathy, cervical spondylosis without myelopathy, and cervical radiculitis. (*Id.* at 1043-44.)

On June 23, 2016, Plaintiff returned to OT Clinic to re-establish treatment for pain relief until he could undergo fusion surgery. (*Id.* at 542-49.) He reported taking muscle relaxers and Hydrocodone to manage his pain, which worsened with sustained upright positions and activity such as household chores, yardwork, and long drives. (*Id.* at 542.) In the following month, Plaintiff had 10 physical therapy sessions. (*Id.* at 512-41.) He initially complained of muscle tightness and restriction and 6/10 pain in left cervical paraspinals and scalene muscles, and he had abnormal posture and decreased cervical and lumbar range of motion, but later reported decreased or no cervical pain and feeling "better than [he] ha[d] in awhile". (*Id.* at 520, 532-41.) In mid-July 2016, Plaintiff complained of lower back pain, which he had experienced for the same amount of time as his neck pain, but he had not previously sought treatment for it; he was re-evaluated to incorporate lower back treatment into his plan of care. (*Id.* at 526-27.) He had difficulty performing household chores, but he had not filled a pain medication prescription from three weeks earlier. (*Id.* at 526.)

On September 15, 2016, Plaintiff presented to Village Health Partners for a preoperative appointment with Ryan J. Hewitt (Internist). (*Id.* at 591-94.) He complained of gout, arthritis, muscle aches, joint pain, back pain, and loss of strength, but he denied joint swelling. (*Id.* at 592.) He had normal gait and no clubbing, cyanosis, or edema. (*Id.*) He was diagnosed with cervical disc disease and assessed with a low risk for medical complications from fusion surgery. (*Id.* at 593.)

---

acdf.htm (last visited Oct. 6, 2022).

A week later on September 22, 2016, Plaintiff presented to ENT & Allergy Centers of Texas for a pre-operative clearance by Kenneth Hsu, M.D. (ENT Doctor). (*Id.* at 609.) Plaintiff had intact cranial nerves and no palpable masses on the neck. (*Id.* at 1040-41.) He was diagnosed with "other spondylosis with radiculopathy, cervical region" and was cleared for fusion surgery from an "ENT perspective". (*Id.* at 611, 1042.)

On September 28, 2016, Plaintiff underwent fusion surgery by Back Doctor. (*Id.* at 613, 625-28.) His hardware at C5-6 and C6-7 was removed "uneventfully", and he underwent fusion surgery at C6-7. (*Id.*) The cervical fascia interval was identified and carefully dissected with "difficult[y]" because of Plaintiff's previous C-spine surgery, but "[a]ll screws had a good bite", the "[l]ocking mechanism was engaged", and the final fluoroscopy images confirmed that the "correct" levels had been operated upon and the orientation of the hardware construct was "adequate". (*Id.* at 626-27.) He was assessed with "other spondylosis with radiculopathy, cervical region". (*Id.* at 1039.) On October 10, 2016, he returned to Back Doctor for the first post-operative visit. (*Id.* at 622-24.) The cervical incision was clean and dry; the right hip incision had mild drainage secondary to what appeared to be a stitch abscess, but there was no gross dehiscence or purulence. (*Id.* at 623.) He reported having "worse" pain at the iliac crest bone graft donor site on the right hip; he was taking Augmentin and Etodolac. (*Id.* at 622.) He had difficulty ambulating, mild peripheral cellulitis around the hip incision, and a limp on the right leg, but 5/5 strength in the bilateral upper and lower extremities, and he did not use an assistive aid. (*Id.* at 622-23.) He was continued on Augmentin and diagnosed with C-spine fusion at C5-6 and C6-7, cervical spondylosis at C4-5, cervical pseudoarthrosis with revision C-spine fusion at C6-7, lumbar radicular syndrome, and L5-S1 internal disc derangement. (*Id.* at 623.)

On October 27, 2016, Plaintiff completed a function report, indicating he took care of a

seven-year-old child, slept on a recliner due to back issues, had no issues with personal care, and prepared his own meals except for when his back and neck "act[ed] up." (*Id.* at 362-69.) He was right-handed and had trouble with the ability to lift, stand, walk, sit, climb stairs, use hands, concentrate, and complete tasks. (*Id.* at 367.) He could lift 10 pounds, but not over his head, and walk 30 minutes before needing a 15-minute break. (*Id.* at 364, 367.) He could drive, go out alone, shop in stores, handle his money, and do light housework, including washing dishes. (*Id.* at 365.)

Between November 15, 2016, and February 15, 2017, Plaintiff presented to OT Clinic for 15 physical therapy sessions. (*Id.* at 670-73, 767-809.) In November 2016, he had increased pain and tenderness in cervical musculature, decreased C-spine active range of motion, decreased upper extremity strength, and abnormal posture, which contributed to decreased tolerance for activities of daily living. (*Id.* at 802, 807-08.) A 6-week physical therapy treatment plan with 2-3 sessions per week was recommended. (*Id.* at 803-05, 808.) He presented with 2/10 cervical pain and increased tolerance for C-spine active range of motion; muscle restriction, stiffness, tenderness, and 6/10 pain in the bilateral upper trapezius musculature; and 4/10 pain at the left SCM muscle and in shoulder "B" rhomboids and lower neck paraspinals. (*Id.* at 782, 784, 786, 788-90, 792, 794, 796, 798, 801.) In late December 2016, he demonstrated poor postural alignment of the shoulder complex and C-spine and reported that illness had prevented him from performing the home exercises. (*Id.* at 780, 784, 786.) In late January 2017, he reported increased left-sided neck pain after riding in a car for 8 hours, but he was feeling better and ready to resume physical therapy. (*Id.* at 670-73, 777-78.) When treatment was re-established, he had 4+/5 to 5/5 muscle strength and normal shoulder range of motion but reduced cervical range of motion. (*Id.*) He was advised to continue physical therapy. (*Id.*) After being counseled on compliance with home exercises and physical therapy sessions, he was discharged from care on March 15, 2017, for failing to contact

the clinic or return any phone calls to schedule follow-up appointments. (*Id.* at 766-72.)

On December 14, 2016, state agency medical consultant (SAMC) Scott Spoor, M.D., reviewed Plaintiff's medical evidence on record and submitted a Physical Residual Functional Capacity Assessment. (*Id.* at 118-20.) SAMC Spoor opined that Plaintiff's allegations were partially supported by the medical and other evidence of record, and that he could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of 4 hours, and sit for about 6 hours in an 8-hour workday. (*Id.* at 118-19.) He was not limited in balancing or pushing and/or pulling other than the lift and/or carry limitations, and could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds, due to having C-spine fusion surgery twice. (*Id.* at 119.) He could finger, feel, and handle, but was limited in bilateral overhead reaching. (*Id.* at 119-20.) SAMC Spoor opined that Plaintiff could work at a sedentary exertional level. (*Id.* at 121.)

On December 19, 2016, Plaintiff presented to Back Doctor for a three-month follow-up and reported feeling better than the year before. (*Id.* at 674-76, 914-16.) He used no assistive aids and had 5/5 muscle strength in the bilateral upper and lower extremities as well as a clean, dry, and intact iliac crest bone graft incision. (*Id.* at 914-15.) He was advised to continue taking muscle relaxers, follow up in three months for x-rays, and consider returning to work with "more solid" healing after completing physical therapy. (*Id.* at 915.)

On March 8, 2017, Plaintiff presented to Village Health Partners for a physical exam. (*Id.* at 1026-29.) He reported going to physical therapy and taking Ibuprofen for pain. (*Id.* at 1026.) He had a normal physical examination, was prescribed over-the-counter medicine for rectal issues, received a colonoscopy referral, and was given a one-month follow-up. (*Id.* at 1027-28.) Family nurse practitioner Janelle Plourde signed the treatment note. (*Id.* at 1029.) Days later, on March

16, 2017, he returned to Village Health Partners for gastrointestinal issues, back pain, joint pain, and sleep apnea. (*Id.* at 1020-22.) He appeared well-developed, was in no acute distress, and had normal gait and normal range of motion in the neck. (*Id.* at 1021.) His respiratory and cardiovascular examinations were normal, he had normal bowel sounds, and his abdomen was non-tender and non-distending. (*Id.*) He was referred for an esophagogastroduodenoscopy (EGD)[6] and colonoscopy. (*Id.* at 1022.)

On April 5, 2017, Plaintiff presented to Internist for a follow-up appointment. (*Id.* at 1023.) He reported a desire to stop smoking, his diagnosis of hyperlipidemia a month earlier, that he had started taking atorvastatin, and his upcoming colonoscopy and EGD. (*Id.*) His blood pressure was 138/80. (*Id.* at 1024.) His physical examination was normal. (*Id.*) He was prescribed Bupropion for hyperlipidemia and advised to maintain a healthy diet and exercise. (*Id.* at 1025.)

On April 15, 2017, Plaintiff presented to Tri Le, M.D. (Examiner) for a physical consultative examination. (*Id.* at 811-19.) He reported disability due to neck, back and hip problems. (*Id.* at 811.) He had good hand-eye coordination, grossly intact cranial nerves, 5/5 muscle strength in all tested areas, and a symmetric, steady, and slow gait, and he did not use an assistive device. (*Id.* at 814.) There was no thyromegaly, thyroid nodule, or mass appreciated; his cervical extension was slightly reduced at 50 percent, but the rest of his range of motion was unremarkable. (*Id.* at 813, 815.) Plaintiff had no difficulty getting up and down from the examination table, could rise to a sitting position without assistance, and was able to lift, carry, and handle light objects. (*Id.* at 815.) Imaging showed mild degenerative disc disease in the L-spine and mild degenerative changes in the hip and right knee. (*Id.* at 817.) He reported a history

---

[6] EGD is a "diagnostic endoscopic procedure used to visualize the oropharynx, esophagus, stomach, and proximal duodenum." Rajni Ahlawat et al., *Esophagogastroduodenoscopy*, NIH.gov, www.ncbi.nlm.nih.gov/books/NBK 532268 (last updated Nov. 7, 2021).

of degenerative disc disease, status post fusion, and revision surgery. (*Id.* at 816.) Examiner opined that he could sit "normally" in an 8-hour workday with "normal" breaks, had "mild" limitations with walking and standing and "moderate" limitations with lifting and carrying, and could not bend, stoop, crouch, or squat. (*Id.*)

On April 27, 2017, SAMC Clarence Ballard, M.D., reviewed Plaintiff's medical evidence on record and submitted a Physical Residual Functional Capacity Assessment. (*Id.* at 133-34.) He opined that Plaintiff's allegations were partially supported by the medical and other evidence of record, and that he could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (*Id.* at 132-33.) He was not limited in his ability to manipulate, balance, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds, but could occasionally stoop, kneel, and crouch. (*Id.* at 133-34.) Based on his assessment, SAMC Ballard opined that Plaintiff could perform work at a light exertional level. (*Id.* at 135.)

On May 11, 2017, Plaintiff saw Back Doctor for back pain and left leg pain. (*Id.* at 923.) C-spine x-rays of anterior-posterior (AP) flexion and extension revealed cervical fusion at C5-6 and C6-7, that "[b]oth fusions appeared solid with no hardware failure", and C4-5 spondylosis. (*Id.*) Lumbar x-rays of AP flexion and extension revealed no significant scoliosis, no spondylolisthesis, and loss of disc height with vacuum phenomenon at L5-S1. (*Id.*) The same day, Plaintiff visited Internist for a follow-up, complaining of chronic back pain. (*Id.* at 1013.) He had diffuse abdominal tenderness but an otherwise normal physical examination; he was prescribed Atorvastatin, Bupropion, and Ondansetron, and scheduled for more imaging. (*Id.* at 1013-15.)

On May 30, 2017, an L-spine MRI revealed degenerative disc changes at L5-S1 and mild disc protrusions at L4-L5 and L5-S1; a C-spine MRI revealed mild posterior ridging and an

"[o]therwise unremarkable examination"; and a T-spine MRI revealed a small disc protrusion at T7-T8, but no evidence of spinal stenosis or neural impingement. (*Id.* at 887-88, 926-28.)

On June 16, 2017, Plaintiff presented to Craig Lankford, M.D. (Pain Doctor), for lower back pain. (*Id.* at 932-34, 1010-11.) He had lumbar restricted range of motion and lumbar disc arrangement L4-5 L5-S1. (*Id.* at 1006, 1010.) He had a history of C-spine fusion at CS-6 and C6-7 with associated spondylosis at C4-5, and he required revision fusion surgery at C6-7. (*Id.*) He had occasional numbness on the right side, but no radiating leg pain or weakness, primary lumbosacral backache with stiffness, and increasing pain with activities and range of motion. (*Id.*) His gait was balanced, his pelvis and shoulders were level with the floor, and he was able to sit comfortably. (*Id.* at 1007, 1011.) His bilateral paravertebral muscles were tender, lumbar range of motion was painful, and he had pain on flexion, extension, rotation on the left and right, and lateral bending to the left and right. (*Id.*) His spinous processes were non-tender, and he had normal straight leg raises bilaterally with no issues. (*Id.*) His strength was symmetrically present in all lower extremity muscle groups, his lower extremities reflexes were symmetrically present and normal, and there was no gross deformity in the lower extremities bilaterally. (*Id.*) He demonstrated non-tender, active, passive, and unrestricted range of motion of the hips, knees, ankles, and feet. (*Id.*) He had normal muscle tone and no cyanosis of the toes or lymphedema (or swelling)[7] of the lower extremities. (*Id.*) He was diagnosed with spondylolisthesis, degenerative disc disease, and tenderness from L3 to the sacrum. (*Id.*)

On July 11, 2017, Pain Doctor diagnosed Plaintiff with lumbosacral spondylosis without radiculopathy and administered bilateral L3-4, L4-5, and L5-S1 facet joint injections. (*Id.* at 1008.) A week later, on July 18, 2017, Plaintiff reported that the facet joint injections had not helped. (*Id.*

_____

[7] *See Lymphedema*, Stedmans Medical Dictionary (2014).

at 935-37.) His gait was balanced and his pelvis and shoulders were level with the floor, but he had tenderness over the sacroiliac area. (*Id.* at 936.) Pain Doctor recommended diagnostic bilateral sacroiliac injection under direct palpation without sedatives and advised Plaintiff to continue to be off work because he could not lift "heavy" packages of meat. (*Id.*)

On August 24, 2017, Plaintiff again returned to Pain Doctor and complained of lower back pain. (*Id.* at 999.) He was in no acute distress and had independent gait, tenderness across the lumbosacral, and normal neurological function in the lower extremities with strength, coordination, and light touch sensation. (*Id.*) The same day, he received bilateral L3-4, L4-5, and L5-S1 facet joint injections. (*Id.* at 1001, 1003.) He was diagnosed with lumbosacral spondylosis without radiculopathy and discharged the same day in stable condition. (*Id.*)

On December 11, 2017, Pain Doctor noted that Plaintiff was "not interested" in receiving additional medications and was "hesitant" to proceed with additional injections. (*Id.* at 943.) He had no radiating leg pain or weakness and reported that he would like to re-establish physical therapy treatment. (*Id.* at 942.) Back Doctor opined that Plaintiff could not tolerate the standing, lifting, and bending required for his job. (*Id.* at 943.)

On January 26, 2018, Plaintiff presented to Baylor Family Medical Center (Baylor) for a follow-up to an emergency room visit for chest pains. (*Id.* at 821.) His electrocardiogram, chest x-ray, and laboratory studies were noted as "unremarkable." (*Id.*) He denied weakness, had normal extremity strength and sensation and no edema, and was assessed with chest pain, hypertension, chronic neck pain, and tobacco use. (*Id.* at 822-23.) On February 12, 2018, Plaintiff returned to Baylor for a vaccination follow-up. (*Id.* at 826-29.) His physical examination was normal, and he was assessed with hypertension, hypercholesteremia, tobacco use, polycythemia, and hyperkalemia. (*Id.* at 827-28.)

On February 21, 2018, Plaintiff returned to OT Clinic for physical therapy. (*Id.* at 996.) He reported that he had undergone testing due to his high blood pressure and heart rate, and his cardiologist had advised him to donate blood to lower his heart rate. (*Id.*) He also reported ongoing pain and not "doing much at home"; he had "good" rehabilitation potential. (*Id.*)

On March 12, 2018, Plaintiff presented to Baylor for a follow-up. (*Id.* at 831-34.) He had a normal physical examination but elevated blood pressure and red blood cell count. (*Id.* at 832.) He was advised to take cholesterol medication, counseled on tobacco use, and assessed with hypertension, polycythemia, tobacco use, atypical chest pain, family history of heart disease, and hypercholesteremia. (*Id.* at 833.)

At least twice in March 2018, Plaintiff returned to OT Clinic for physical therapy for continued cervical and lumbar pain. (*Id.* at 971-74, 988-89.) He responded "well" to manual lumbar traction and had "good" hip mobility, but also had lower back pressure with passive flexion and decreased reciprocal movement in his gait. (*Id.* at 972-73.) He reported throbbing, burning, and stabbing neck pain, which worsened with movement. (*Id.* at 971.) He was assessed with increased pain, decreased strength/stability, decreased range of motion/flexibility, paresthesia[8], and decreased activities of daily living/function. (*Id.* at 974, 989.) His medical history noted "uncontrolled" blood pressure and that he was seeing a cardiologist. (*Id.* at 971.) Plaintiff had not made progress because high blood pressure and "other cardiovascular concerns" had prevented him from receiving physical therapy treatment, so his blood pressure medication had been adjusted to allow him to regularly attend physical therapy and perform home exercises on off days. (*Id.* at 973.) A 6-week schedule was recommended, with two physical therapy sessions per week as long

---

[8] Paresthesia is a "spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking)" and it "may be due to lesions of both the central and peripheral nervous systems." *Paresthesia*, Stedmans Medical Dictionary (2014).

as his blood pressure stayed within normal limits. (*Id.* at 974.) On April 20, 2018, When Plaintiff presented to OT Clinic for physical therapy on April 20, 2018, he reported feeling better after taking blood pressure medication and mild relief of low back muscle tension post-treatment. (*Id.* at 986-87.) His "inconsistent" visits to therapy and "limited" progress were noted. (*Id.* at 987.)

At least three times in May 2018, Plaintiff presented to OT Clinic for physical therapy. (*Id.* at 967-70, 982-85.) His cervical range of motion was 70 percent with right rotation, 80 percent with left rotation, and within normal limits for right side, left side, and backward bending, but he had pain on the left side with all range of motion and overpressure. (*Id.* at 968.) His lumbar range of motion revealed some increased popping with backward bending, increased pressure with side bending and rotation, and hamstring tightness with forward bending. (*Id.*) He had good hip mobility (but low back pressure) and 3+/5 to 5/5 strength in all tested areas. (*Id.* at 968-69.) His attendance had been "intermittent", and he had made "no marked improvements" in strength, range of motion, or pain. (*Id.* at 969, 977.) Since physical therapy was not a "maintenance" program and it would be "inappropriate" for him to continue physical therapy indefinitely for purposes of long-term disability, he was advised to discharge after the following week's session, continue to do home exercises, and return to his orthopedic doctor. (*Id.* at 969-70.)

On August 6, 2018, Plaintiff presented to Pain Doctor, complaining of lower back pain. (*Id.* at 964-66.) Neither physical therapy nor the lumbar facet and sacroiliac joint injections had provided relief. (*Id.* at 964.) His gait was balanced, his pelvis and shoulders were level with the floor, and he was able to sit comfortably. (*Id.* at 965.) He had tenderness in the lumbar paraspinals, and his pain worsened with flexion more than extension. (*Id.*) Because his symptoms persisted despite physical therapy, he was referred for an updated lumbar MRI. (*Id.* at 965-66.)

On September 24, 2018, an L-spine MRI revealed degenerative disc disease at L4-S1 with

mild canal stenoses and "4 mm retrolisthesis L5 on S1". (*Id.* at 961.) T12-L1, L1-L2, L2-L3, L3-L4 were unremarkable, he had normal cauda equina[9] and "well preserved" posterior paraspinal muscles with no signal abnormalities, and there was no evidence of scoliosis or soft tissue "signal abnormalit[y]". (*Id.* at 962.)

On October 2, 2018, Plaintiff returned to Pain Doctor, complaining of lower back pain. (*Id.* at 958-60.) He was able to sit comfortably, his gait was balanced, his pelvis and shoulders were level with the floor, lower extremity strength and reflexes were symmetrically present in the lower extremities, and light touch was normal for all lumbar dermatomes[10]. (*Id.* at 959.) He was assessed with lumbar tenderness with restricted range of motion, negative response to facet joint injections, and persisting symptoms despite physical therapy. (*Id.*) He was diagnosed with degenerative disc disease of the L-spine, degenerative joint disease of the lumbosacral spine, lumbar facet joint pain, lumbar back pain with radiculopathy, cervical spondylosis without myelopathy, cervical radiculitis, and hypertension. (*Id.* at 960.) Because he had "failed" conservative management and had not responded to facet joint injections, Pain Doctor recommended a referral for a second opinion by Back Doctor. (*Id.*)

On October 10, 2018, Back Doctor noted that Plaintiff had 5/5 strength in the upper and lower extremities and that an MRI of the L-spine did not show "severe central compression of cauda equina". (*Id.* at 955-57.) He recommended lumbar epidural steroid injections to provide "symptomatic relief" of radiculopathy. (*Id.* at 956.) He continued the diagnoses found by Pain

---

[9] Cauda equina is "the bundle of spinal nerve roots arising from the lumbosacral enlargement and medullary cone and running through the lumbar cistern (subarachnoid space) within the vertebral canal below the first lumbar vertebra; it comprises the roots of all the spinal nerves below the first lumbar." *Cauda equina*, Stedmans Medical Dictionary (2014).

[10] "The skin has been mapped into sections called dermatomes to show the nerve supply to each section." Robert E. Hair, A.B., et al., *Spinal Cord Injuries*, 37 Am. Jur. 2d 291 § 4 (1984 & Update Aug. 2022).

Doctor a week earlier. (*Id.* at 956-57.)

On August 4, 2020, almost two years after Plaintiff's last visit, Pain Doctor responded to interrogatories on his medical history. (*Id.* at 1047-50.) He opined that Plaintiff was likely to miss an average of 10 or more workdays per month due to the combination of symptoms from his medical conditions, including:

> [L]umbar disc disease with disc problems at L4-5, LS-SI; cervical disc disease with history of fusion and later revision surgeries, cervical radiculitis, chronic pain with lumbar facet and sacroiliac blocks without any sustained relief, history of physical therapy without sustained pain relief, and … other medical conditions[.]

(*Id.* at 1047, 1049.) He also opined that Plaintiff would need to rest 5 hours in an 8-hour workday due to "[c]hronic intractable back and neck pain affecting standing, walking, lifting, [and] carrying activities"; this was the only comment he wrote on the form. (*Id.* at 1049.) He marked "yes" to indicate that Plaintiff's condition existed since "at least" April 2, 2016. (*Id.* at 1048, 1050.) He certified that his answers to the interrogatories were based on his education, experience, training, his patient's medical history as known to him, his physical examinations, treatment, and laboratory findings. (*Id.*)

## C. <u>April 19, 2018 Hearing</u>

On April 19, 2018, Plaintiff and an impartial VE testified at a hearing before the ALJ. (*Id.* at 95-113.) Plaintiff was represented by an attorney. (*Id.*)

### 1. *Plaintiff's Testimony*

On examination by his attorney, Plaintiff testified that he was born on November 14, 1967, was 50 years old, was 6 feet 5 inches, had gained 10 pounds in the previous year due to mobility issues, and weighed 189 pounds. (*Id.* at 96-97.) He was married and had a minor daughter who lived with him and an adult son. (*Id.* at 97.) He was right-handed, had completed high school, never served in the military, had worked as a meat department manager for 15 years, and had not

16

worked since April 2016. (*Id.* at 97-98.) He had been on six months of short-term disability, and at the time of the hearing, received $1,800 per month through his job's long-term disability plan; he denied receiving any other income, such as unemployment benefits, worker's compensation, or food stamps. (*Id.* at 98-99.) He had insurance through his wife's employment. (*Id.* at 99.)

In 2009, Plaintiff had neck surgery and returned to work after "extensive" physical therapy. (*Id.*) In April 2016, he began waking up with numbness in his left arm and leg, and his back and neck started cramping. (*Id.* at 99-100.) His last day of work, April 4, 2016, was followed by physical therapy, "neck reconstruction" surgery in September 2016, and more physical therapy. (*Id.* at 100.) Since the surgery, he continued to have spasms, pain at the base of the skull that radiated to his shoulder blades and across his shoulders, and numbness, although some had subsided. (*Id.* at 101.) Activity worsened his pain, and he had numbness in his left arm, but he could lift a gallon of milk in each hand. (*Id.*) His right hand had a callous the size of silver dollar due to "holding a knife for 30 years", and he planned to have surgery in the future, as recommended by an examining physician in 2016, but he was not receiving any treatment for it. (*Id.* at 106-07.)

Plaintiff could stand or walk for about 30 minutes to an hour before his leg went numb, and he had to use his other leg for balance; the terrain affected how long he could walk. (*Id.* at 102.) He had undergone 8 spinal injections during two separate outpatient surgeries for lower back pain. (*Id.* at 99-100.) He could sit for only so long before he got spasms in his lower back and had to stand up and do some of his physical therapy "routines", including a "wall stretch". (*Id.* at 102.) He was continuing to receive physical therapy at OT Clinic as "frequently" as he could, or once or twice a week, although the last five times he had not been able to receive treatment because his blood pressure was "too high". (*Id.* at 103.) An MRI had recently revealed that his discs were deteriorating at a "substantial" rate. (*Id.* at 106.)

Plaintiff cooked but could not retrieve pans from the bottom cupboards because they were "too low" to the ground and "too far back" for him to reach. (*Id.* at 103.) He could independently shower, dress and care for himself with no difficulty. (*Id.* at 104.) He had a driver's license and drove, but not for more than an hour; after that, he began to feel "very, very uncomfortable". (*Id.*) When his pain was "minimal", he enjoyed spending time with his daughter and visiting his parents' home, but he did nothing "substantial". (*Id.*)

Plaintiff denied being able to work as a bagger or a cashier because he could not do "heavy" lifting or stand "all day". (*Id.* at 105.) He denied being able to sit for most of the day and answer phones because he would need to stand and walk around. (*Id.*) He also had to lie down almost every day for about an hour or an hour and a half to "compensate" for not getting enough rest at night. (*Id.* at 105-06.)

Plaintiff took hot showers for pain relief. (*Id.* at 102-03.) Although he had no substance abuse issues at the time of the hearing, he declined to take pain medications because of addiction issues in the past, which he described as the "most awful" part of his life. (*Id.* at 102, 106.) He denied receiving any treatment for any mental or emotional conditions. (*Id.* at 106.)

On cross-examination, Plaintiff testified that he underwent a full spine MRI on June 14, 2017, and that it should have included the neck area. (*Id.* at 107-08.) He continued to receive treatment from Texas Back Institute through 2017 to improve range of motion of the neck, including physical therapy and stretching but not injections, which were administered solely for his lower back.[11] (*Id.* at 108.) Although his neck and lower back problems were "equal" and "at the same time", Back Doctor wanted to address the neck issue first and to eventually also address

---

[11] Plaintiff's counsel represented that the 2017 medical records from Texas Back Institute had been requested and were outstanding at the time of the hearing; the ALJ gave Plaintiff 30 days to submit them. (doc. 9-1 at 108-09.)

his back issue. (*Id.* at 108-09.) After performing the revision surgery (or graft) on his neck in 2016, Back Doctor had not recommended any other surgeries. (*Id.* at 109.)

### 2. *VE's Testimony*

The VE testified that Plaintiff had relevant past work (medium exertional level and SVP-6)[12], and there were no transferable skills to light work or sedentary jobs. (*Id.* at 110-11.)

The VE first considered a hypothetical individual with Plaintiff's age, education and work experience, and who could lift 20 pounds occasionally, 10 pounds frequently, stand and walk 4 hours out of an 8-hour workday, sit for 6 hours out of an 8-hour workday, and was limited in his ability to stoop, kneel, and crouch occasionally. (*Id.* at 111.) The individual could not perform Plaintiff's past work, but he could perform light exertional jobs such as a mailroom clerk (DOT 209.687-026, light, SVP-2), with 73,000 jobs nationally; office helper (DOT 239.567-040, light, SVP-2), with 150,000 jobs nationally; and marker (DOT 920.687-126, light, SVP-2), with 230,000 jobs nationally.[13] (*Id.*)

The VE considered a second hypothetical individual with Plaintiff's age, education, and work experience, and who could stand for 1 hour at most due to pain and needed at least 10 minutes every hour to address his pain throughout the workday. (*Id.* at 112.) She opined it would impact his ability to maintain employment competitively because employees are permitted to be off-task 10 percent of the time, and an individual who was off-task more than that would be unlikely to meet the employer's production expectations. (*Id.*)

The VE considered a third hypothetical individual who would be off-task 1 hour out of an

---

[12] DOT stands for Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

[13] A marker works at a distribution center, affixing labels or plastic tags onto products, like garments, before they are sent to department stores for sale. (doc. 9-1 at 111-12.)

8-hour workday at unanticipated times.  Because that would essentially be 10 percent of a workday, she opined that it fell within normal expectations. (*Id.*)[14]

**D.  September 1, 2020 Supplemental Hearing**

After remand, on September 1, 2020, Plaintiff, a second impartial VE, and Examiner[15] testified at a supplemental hearing before the ALJ. (*Id.* at 47-91.) Plaintiff was represented by an attorney. (*Id.*)

*1.  Examiner's Testimony*

Although a copy of the consultative examination report he prepared for Plaintiff on April 15, 2017, was attached to the subpoena issued to him by the ALJ, (*id.* at 304), Examiner testified that he had no recollection of examining Plaintiff, (*id.* at 56).  He had not kept a copy of the report because records were kept by the company formerly known as CE Providers, which no longer employed him. (*Id.* at 55-56.)

Examiner graduated from medical school in 2014, and became board certified in internal medicine in the latter half of 2017. (*Id.* at 56.)  At the time of the hearing, he was training for hematology/oncology at UT Southwestern; he did not "normally" evaluate orthopedic patients for orthopedic problems. (*Id.* at 56-57.) If he had reviewed any medical records, MRIs or surgery reports for Plaintiff, he "likely" would have mentioned them in the consultative report; he could

---

[14] The ALJ gave Plaintiff's attorney an opportunity to present further hypotheticals, which was declined. (doc. 9-1 at 112-13.)

[15] The Appeals Council's remand order instructed the ALJ to:

> Give further consideration to [Examiner's] assessment pursuant to the provisions of (20 CFR 404.1527), and explain the weight given to such opinion evidence. As appropriate, the [ALJ] may request the nontreating source to provide additional evidence and/or further clarification of the opinion (20 CFR 404.1520b).

(doc. 9-1 at 158.)  On July 25, 2020, Plaintiff requested that the ALJ order a consultative examination by a board-certified orthopedic specialist, or in the alternative, issue a subpoena to Examiner. (*Id.* at 431-32.) The ALJ issued a subpoena to Examiner three days later, on July 28, 2020. (*Id.* at 304.)

not guarantee that he had reviewed any such reports or included them in the consultative report, however. (*Id.*) It was his practice then to request for review any MRIs or operative reports of which he was aware that bore "particular" relevance to the issue he was addressing. (*Id.* at 57-58.) If he did not review any relevant medical records, it was because CE Providers did not provide them to him, not because he did not request them. (*Id.* at 58.)

At CE Providers, Examiner was contracted to perform a one-time physical examination of a patient, evaluate any relevant documents, and fill out a template identifying the patient's ability to perform specific tasks; if he was unable to make a determination about a patient's abilities, he would state that. (*Id.* at 58-59.) Because he had no longitudinal record or follow-up with any of those patients, his examination was a "snapshot in time". (*Id.* at 59.)

Examiner testified he could not "speak generally" about whether a different kind of physician usually evaluated orthopedic patients with a history of surgery because it depended on the situation, and the term "orthopedic patient" was very broad. (*Id.*) If he had a patient who showed symptoms of radiculopathy and had a history of surgery, he would "perhaps" refer him to an orthopedic or "physical medicine and rehabilitation" doctor, but it would depend on where the patient was being treated and the degree of his issues. (*Id.* at 59-60.)

Based on representations by Plaintiff's counsel that Pain Doctor, whom he did not know, treated Plaintiff on "repeated" occasions and was certified by the American Board of Physical Medicine and Rehabilitation since 2006, Examiner opined that Pain Doctor was in a "better" position to give an opinion about Plaintiff's abilities. (*Id.* at 60.)

Examiner did not know the physician who took Plaintiff's x-rays around the time of the consultative examination, but he commonly reviewed x-rays in his practice and role. (*Id.* at 60-61.) He would not rely on an x-ray report from a "non-board certified" pathologist or

pulmonologist because x-rays are interpreted by radiologists. (*Id.* at 61.)

If a patient had a history of degenerative dystrophy and post cervical vertebrae cadaver graft of the vertical spine and presented with chronic cervical and thoracolumbar pain, the "best" type of doctor to examine the patient would depend on the reason for the patient's evaluation. (*Id.*) If the evaluation was for physical capacity, Examiner opined that the "gold standard" would be a physical medicine and rehabilitation physician or a physical therapist. (*Id.* at 61-62.)[16]

### 2. *Plaintiff's Testimony*

Plaintiff testified that he worked in store management at Family Dollar, where he worked as a cashier 50 percent of the time and did "occasional" or "light" stocking. (*Id.* at 63.) He worked there for less than 6 months, from late August 2019 through mid-March 2020. (*Id.*) The work was "very strenuous" and "very hard" on him, and every part of the job, from stocking a case of potato chips to sweeping the floor, had "consequence[s]" on his body, including causing him to lose 30 pounds. (*Id.* at 63-64.) He did "a lot" of standing and "some" bending, and "a lot" of times he wanted to lie down to take the pressure off his lower back, neck, and knees, but because he was required to work on a "skeleton crew", i.e., alone, he was unable to take breaks or sit on an office chair provided to him to assist customers who "had to come first". (*Id.*)

OT Clinic conferred with Pain Doctor and told Plaintiff that they had "r[u]n out of options until the next physical thing", such as future deterioration or another hardware malfunction. (*Id.* at 64-65.) Until then, he sat in a reclined position and tried to "keep everything together". (*Id.* at 65.) In the previous 18 months, he had not returned to Pain Doctor or OT Clinic to talk about his options. (*Id.*) He was not taking any pain medication at the time. (*Id.*) Plaintiff was unable to

---

[16] After Plaintiff's counsel thanked him for his testimony, Examiner testified he was out of time because he had patients waiting for him; the ALJ excused him from the hearing. (doc. 9-1 at 62.)

consistently attend physical therapy due to financial reasons "more … than anything" because his insurance carrier had changed, and he was limited in the number of times he could receive rehabilitation. (*Id.* at 65-66.)

Plaintiff was no longer caring for an aunt who had moved out of his home a year and a half earlier. (*Id.* at 66.)  She had dementia, and he did not have to do anything for her other than remind her to take her medication. (*Id.* at 68-69.) His minor daughter, who was "pretty self-sufficient" and lived with him, was primarily cared for by his wife, who worked outside the home. (*Id.* at 66-67.) Plaintiff estimated he was able to do 10 percent of the household chores, including cleaning, laundry, and shopping, and his wife did the rest. (*Id.* at 67.) He did not do any grocery shopping, other than to drive to pick it up curbside, but he did some light cooking and washed any dishes he used. (*Id.* at 67-68.)

Even if he had to pay a 10 percent penalty, Plaintiff occasionally withdrew from his 401K with Tom Thumb to supplement his wife's salary. (*Id.* at 69-70.)

Plaintiff weighed 170 pounds at the time; the lowest he had weighed was 150 pounds. (*Id.* at 70.) When he worked as a meat department manager, he weighed at most 200 pounds. (*Id.*)

It felt "good" to get out of the house when Plaintiff started working at Dollar General, but when he returned home with pain, he felt "even worse". (*Id.*)

Plaintiff's neck surgery in 2009, which was not the result of an injury or accident, went well. (*Id.* at 70-71.) After the surgery, he submitted to "fairly long" rehabilitation before returning to work, and everything was "great" until he suddenly needed a second surgery because he woke up with half of his body numb. (*Id.* at 71.) His first surgery was completed with "cadaver bones", while the second surgery used bone removed from his hip. (*Id.*) He submitted to physical therapy after the second surgery, but it did not relieve his pain. (*Id.*) He tried other kinds of treatment,

including "over dozens" of injections administered by Pain Doctor, but they only provided relief for a day or two. (*Id.* at 71-72.) Although he still had pain, he was not taking pain medication because he had taken it in the past, including Oxycontin and an unspecified barbiturate; he threw them away one day because he was having problems with narcotic medications, and "[he] was about to lose [his] wife". (*Id.* at 72-73.)

Plaintiff had pain "very, very high up" in the neck, back, and in the front near his throat, and he had knots up and down both shoulder blades. (*Id.* at 73.) His pain was pinching, twisting, stabbing, and intense, like having a charley horse in his throat, and it radiated to parts of his arm and lower back. (*Id.*) Every day, he had an unpleasant poking pain in his lower back that did not radiate but caused him to walk "hunched over' and like a duck to relieve it; this affected his knees and legs. (*Id.* at 74.) To relieve the pain, he also reclined about three-quarters of a day, including 5 hours between the hours of 9:00 a.m. and 5:00 p.m. (*Id.* at 74-75.) He slept four or five hours per night and "seldom" woke up "refreshed" because he had trouble falling asleep and staying asleep; he usually woke up once or twice per night due to pain and napped while reclining during the day. (*Id.* at 75.) His pain had interfered with his ability to focus and concentrate, and it had led to "a lot" of arguments between him and his wife. (*Id.* at 75-76.)

Plaintiff was able to lift a gallon of milk. (*Id.* at 76.) He could stand on a hard surface, like an office with carpet, for 15 or 20 minutes without taking a break; if it was a "soft" surface, he could stand "a little longer". (*Id.*) At most, he could walk 50 to 75 yards at once. (*Id.*) He could sit 15 to 30 minutes, depending on the chair, before he needed to get up and move around. (*Id.* at 77.) He had problems reaching overhead and straight out in front of him; he would be unable to do so while holding or carrying anything because his neck and shoulder muscle would "g[e]t up on [him]" and cause him pain. (*Id.*) Plaintiff, who was right-handed, had a "huge", silver dollar-size

callus on his right hand that went from his palm to his knuckles and made it hard for him to grasp. (*Id.* at 77-78.) He did everything sitting down and sometimes did not change out of his nightclothes "for several days in a row". (*Id.* at 78.) Although he sometimes skipped them, when he did shower, he used the detachable shower head because he was unable to put his head back, and he had balance problems, which required him to "brace [him]self". (*Id.*) He did light cooking or used a crock pot, and he usually made enough to last several meals. (*Id.*) He used to spend a lot of time at his daughter's school functions, but he "sometimes" decided not to attend them because he did not know how uncomfortable it would be. (*Id.* at 79.) He no longer did other "outside activities", like fishing or going to the movies or the mall. (*Id.*)

Plaintiff testified that not being able to return to his manager job had been "stressful" and "boring", but that the "upside" was that his pain at the time was "literally 20 fold". (*Id.*) If he were able to return to work, he would be working. (*Id.* at 79-80.)

### 3. VE's Testimony

The VE testified that Plaintiff had relevant past work as a meat butcher (DOT[17] 316.681-010, heavy, SVP-6). (*Id.* at 81.)

The VE first considered a hypothetical individual with Plaintiff's age, education, and work history, who could lift, carry, push or pull up to 20 pounds occasionally and 10 pounds frequently, stand or walk for 6 hours out of an 8-hour workday, sit for 6 hours out of an 8-hour workday, climb ladders, ropes, or scaffolds occasionally, and stoop, kneel, crouch, and crawl occasionally. (*Id.*) The individual could not perform Plaintiff's past work, but he could work as a housekeeping cleaner (DOT 323.687-014, light, SVP-2), with 158,000 jobs nationally; cashier II (DOT 211.462-

---

[17] DOT stands for Dictionary of Occupational Titles.

010, light, SVP-2), with 837,000 jobs nationally; and mail clerk[18] (DOT 209.687-026, light, SVP-2), with 54,000 jobs nationally. (*Id.* at 81-82.)

The VE considered a second hypothetical individual who could lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds frequently; walk for 4 hours out of an 8-hour workday; sit for 6 hours out of an 8-hour workday; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and reach overhead bilaterally, but never climb ladders, ropes, or scaffolds. (*Id.* at 82-83.) The individual could not perform Plaintiff's past work but could perform a "reduced number" of jobs due to the standing and walking limitation, including cashier II (DOT 211.462-010, light, SVP-2), with 83,700 jobs nationally (reduced by 90 percent); hand packager (DOT 559.687-074, light, SVP-2), with 64,000 jobs nationally (reduced by 20 percent); and bench assembler (DOT 706.684-042, light, SVP-2), with 56,000 jobs nationally (reduced by 50 percent). (*Id.* at 83.)

The VE considered a third hypothetical individual who could lift, carry, push, or pull up to 10 pounds occasionally and less than 10 pounds frequently; stand or walk for 2 hours out of an 8-hour workday; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and reach overhead bilaterally, but never climb ladders, ropes, or scaffolds. (*Id.* at 83-84.) There were no transferable skills to sedentary work, and the individual could not perform Plaintiff's past work, but he but could perform as a document preparer (DOT 249.587-018, sedentary, SVP-2), with 46,000 jobs nationally; final assembler (DOT 713.687-018, sedentary, SVP-2), with 28,000 jobs nationally; and call-out operator (DOT 237.367-014, sedentary, SVP-2), with 22,000 jobs nationally. (*Id.* at 84-85.)

On cross-examination, the VE opined that the individual in any of these hypotheticals could

---

[18] A mail clerk worked in a private company, not the Postal Service. (doc. 9-1 at 81-82.)

miss one day of work per month and still maintain employment. (*Id.* at 85.) An individual who needed to lie down for 5 hours out of the workday could not perform these jobs or any competitive work. (*Id.*)

Because there was no "formal" methodology for determining the reduced number of jobs, the VE calculated the reduction "purely" on her experience working as a rehabilitation counselor for more than 25 years, observing these jobs being performed, and interviewing people who perform jobs in this manner; she had never calculated the reduction "statistically". (*Id.* at 85-86.) The Bureau of Labor Statistics reported the employment statistics in a Standard Occupational Classification (SOC) "grouping" (or code). (*Id.* at 86-87.)[19] After using the DOT, which was last updated in 1991, to select the job titles, she determined the employment statistics of that specific DOT title number by first referencing the SOC codes and ruling out the jobs that no longer existed in the economy at the time. (*Id.* at 87-88.)[20] She then used the North American Industry Classification System to determine the industries in which the remaining jobs occurred, and then added up the number of jobs for those industries. (*Id.*) Although she did not know the exact version of Job Browser Pro that she used to calculate the number of jobs available, it was not the most recent version because she had not yet become "confident" in its reporting and therefore did not rely on its "default numbers". (*Id.*) She instead used her own judgment and experience to determine the industries in which the jobs were likely to occur. (*Id.*)

---

[19] "The Acting Commissioner has acknowledged that there is no data presently existing that shows the number of jobs available in a particular DOT category. Further, job incidence data is currently organized according to the occupational codes used by the Census Bureau and developed by the Bureau of Labor Statistics for use by Federal statistical agencies. These are known as the Standard Occupational Classification (SOC) codes." *McNett v. Comm'r, Soc. Sec. Admin.*, No. 4:20-CV-01200-P, 2021 WL 4848932, at *6 (N.D. Tex. Sept. 27, 2021), *report and recommendation adopted*, No. 4:20-CV-1200-P, 2021 WL 4845776 (N.D. Tex. Oct. 18, 2021).

[20] The VE provided the SOC codes for the following: document preparer (43-9061), final assembler (51-9199), and call-out operator (43-4041). (doc. 9-1 at 88.)

The VE was not aware of any conflict between her testimony and the DOT. (*Id.* at 88.) Because the DOT did not address the limitation of standing and walking to 4 hours out of an 8-hour workday at the light exertional activity, restrictions with reaching in only one direction (i.e., overhead), absenteeism, or an employee's need to lie down during breaks, her opinions on those topics were based on her experiences working as a rehabilitation counselor over the previous 25 years. (*Id.* at 88-89.)

**E.  <u>ALJ's Findings</u>**

The ALJ issued her post-remand decision on October 29, 2020. (*Id.* at 16-28.) At step one, she found that Plaintiff had met the insured status requirements through December 31, 2022, and had not engaged in substantial gainful activity since April 2, 2016, the alleged onset date. (*Id.* at 18.) At step two, she found that Plaintiff had the severe impairments of degenerative disc disease of the C-spine status post fusion, degenerative disc disease of the L-spine, and osteoarthritis, as well as the non-severe impairments of degenerative disc disease of the T-spine, gastrointestinal impairments, high blood pressure, high cholesterol, and polycythemia. (*Id.* at 18-24.) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (*Id.* at 24.) She expressly considered Listings 1.02 and 1.04 in her findings. (*Id.*)

Next, the ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light exertional work, as defined in 20 C.F.R. § 416.1567(b). (*Id.*) At step four, she determined that Plaintiff was unable to perform his past work. (*Id.* at 26.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether

he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 27.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset date of April 2, 2016, through the date of the decision. (*Id.* at 28.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court

may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1. Absent reliable controverting medical evidence from a treating or examining physician, an ALJ may reject the opinion of the treating physician only if she performs a detailed analysis of the opinion under the criteria set forth in 20 C.F.R. § 404.1527. The ALJ did not conduct the required analysis of [Pain Doctor]'s … opinion. Did the ALJ conduct the required analysis and provide good reasons for rejecting [Pain Doctor]'s … opinion?

2. An ALJ must assess the weight to be afforded to the physician's medical opinions of record. The ALJ determined that [Examiner]'s … opinion was entitled to partial weight. Is the ALJ's reasoning for such finding supported by substantial evidence?

3. The ALJ lacked proper authority to render a decision on [Plaintiff]'s disability claim. Statutory limits on the President's ability to remove the Commissioner of Social Security violate constitutional separation-of-powers principles. If the ALJ derived his authority by delegation from the Commissioner, who was appointed under an unconstitutional statutory provision, was the ALJ a properly appointed Officer of the United States?

(doc. 14 at 5.)

### A.  Medical Opinion Evidence

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a

treating source. *Id.* § 404.1527(c)(2).[21] A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent

---

[21] On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed his application before the effective date, the pre-2017 regulations apply.

reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

### 1. *Pain Doctor*

Plaintiff argues that the ALJ failed to perform the required analysis under 20 C.F.R. § 404.1527(c) in determining that the opinions of Pain Doctor, a "treating physician[]", were entitled to "little weight" instead of "controlling weight". (doc. 14 at 16.) The Commissioner responds that the ALJ properly considered Pain Doctor's opinions. (doc. 22 at 20.)

Between June 2017 and October 2018, Pain Doctor examined Plaintiff in person on at least seven occasions for chronic lower back pain. (*See* doc. 9-1 at 932-37, 958-60, 964-66, 999, 1001, 1003, 1006-11.) Pain Doctor noted that Plaintiff's gait was balanced or independent, his pelvis and shoulders were level with the floor, and he was able to sit comfortably in June 2017, August 2018, and October 2018. (*Id.* at 959, 965, 999, 1007, 1011.) In June 2017, he had some numbness but no radiating leg pain or weakness down the right side, his spinous processes were non-tender, he had normal straight leg raises with no issues, and demonstrated non-tender, active, passive, and unrestricted range of motion of the hips, knees, ankles, and feet. (*Id.* at 1007, 1011.) He was in no acute distress in August 2017. (*Id.* at 999.) Plaintiff had lumbar-restricted painful range of motion and lumbar disc arrangement at L4-5, L5-S1 in June 2017, and tenderness across the lumbosacral

in August 2017 and in the lumbar paraspinals in August 2018, but "light touch" was normal for all lumbar dermatomes in October 2018. (*Id.* at 959, 964, 999, 1006, 1010.) He had pain on flexion, extension, rotation on the left and right, and lateral bending to the left and right in June 2017; his pain worsened by flexion more than extension in August 2018. (*Id.* at 965, 1006, 1010.) In June 2017, there was no gross deformity in the lower extremities bilaterally, no lymphedema of the lower extremities or cyanosis of the toes, and normal muscle tone. (*Id.* at 1006, 1010.) Plaintiff's lower extremities strength was symmetrically present in all lower extremity muscle groups, and lower extremities reflexes were symmetrically present and normal in June 2017, August 2017, and October 2018. (*Id.* at 959, 999, 1006, 1010.) He was diagnosed with degenerative disc disease in June 2017, August 2017, and October 2018; with lumbosacral spondylosis without radiculopathy in June 2017 and August 2017; and with lumbar back pain with radiculopathy in October 2018. (*Id.* at 960, 999, 1008.) Pain Doctor noted that Plaintiff had "tried" physical therapy and was administered bilateral L3-4, L4-5, and L5-S1 facet joint injections in July 2017 and August 2017. (*Id.* at 1001, 1003, 1008.) In his last examination in October 2018, Pain Doctor found that Plaintiff's symptoms persisted despite physical therapy and facet joint injections, concluded that conservative management had "failed", and referred him to Back Doctor for a second opinion. (*Id.* at 958-60.)

The ALJ's decision reflected consideration of Pain Doctor's treatment notes and responses to the August 2029 interrogatories, including his findings that:

> [Plaintiff] was reasonably likely to miss work about 10 times per month due to his multiple medical impairments. He noted that [Plaintiff] had lumbar disc disease with disc problems at L4-5 and L5-S1, cervical disc disease with history of fusion and revision, and chronic pain. He further opined that [Plaintiff] would need to rest five hours in an eight-hour workday, and that [his] condition existed since April 2, 2016. He noted that [Plaintiff]'s back and neck pain affected standing, walking, lifting and carrying.

(*Id.* at 23 (citing *id.* at 955-74, 999-1011, 1047-50).)) She noted that Plaintiff visited Pain Doctor

for chronic back pain between June 2017 and October 2018, and he was able to sit comfortably, his gait was balanced, his pelvis and shoulders were level with the floor, and he had no radiating leg pain or weakness but some occasional numbness down the right side. (*Id.* at 23; *see id.* at 955-74, 999-1011.) She also noted that Plaintiff's strength and reflexes were symmetrically present in the lower extremities, a light touch was normal for all lumbar dermatomes, and a September 2018 MRI revealed degenerative disc disease of L4-S1 with mild canal stenosis and 4 mm retrolisthesis at L5 on S1. (*Id.* at 23; *see id.* at 955-74, 999-1011.) She noted that Pain Doctor diagnosed Plaintiff with degenerative disc disease of the L-spine, degenerative joint disease of the lumbosacral spine, lumbar facet joint pain, hypertension, back pain with radiculopathy, cervical spondylosis without myelopathy and cervical radiculitis. (*Id.* at 23 (citing *id.* at 958-66, 999-1001, 1006-11.)) She noted that he considered May 2017 and October 2018 imaging that revealed degenerative disc changes at L5-S1, mild disc protrusions at L4-L5 and L5-S1, and mild cervical posterior ridging without spinal stenosis but otherwise normal C-spine and L-spine MRIs. (*Id.* at 25 (*id.* at 887-88, 923, 926-28.)) She also considered medical records by Back Doctor, whose October 2018 treatment note showed that Plaintiff had 5/5 strength in the upper and lower extremities and that the lumbar MRI did not show severe central compression of cauda equina, and who recommended lumbar epidural steroid injections for relief of radiculopathy during Plaintiff's last visit. (*Id.* at 23 (citing *id.* at 956-57.))  Her decision stated:

> Little weight is given to the opinions of [Pain Doctor], because they are inconsistent with his own records, which show that [Plaintiff] had normal gait and strength. Furthermore, … [Plaintiff] had conservative treatment after the [2016] revision [fusion surgery], sporadic attendance at physical therapy, and few follow-up visits.

(*Id.* at 26 (citing *id.* at 26)) (internal citations omitted).

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1527(c)(1), she specifically stated that she considered opinion evidence in accordance with

the requirements of 20 C.F.R. § 404.1527. (*See id.* at 25.) Her decision reflects consideration of the first, second, third and fourth factors: she found that between June 2017 and October 2018 Pain Doctor both examined and treated Plaintiff and his opinions were "inconsistent" with his own records, which noted that Plaintiff had normal gait, could sit comfortably, had 4+/5 to 5/5 muscle strength, and his C-spine fusion at C5-6 and C6-7 "appeared solid with no hardware failure". (*Id.* at 26 (citing *id.* at 955-74, 999-1011.)) She also specifically noted Plaintiff's "conservative treatment" after the revision fusion surgery, "sporadic" attendance at physical therapy, "few" follow-up visits, and hesitance to proceed with more injections and medication. (*Id.* at 26 (citing *id.* at 670-87, 689-810, 954-74, 999-1011)). The regulations require only that the ALJ "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by* 2013 WL 1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6 (citing *Johnson*, 2010 WL 26469, at *4). Moreover, the ALJ is free to reject the medical opinion of any physician when the evidence supports a contrary conclusion. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981).

The ALJ's reasons for assigning only "little" weight to Pain Doctor's opinions, combined with her review and analysis of the objective record, satisfy her duty under the regulations and constitute "good cause" for affording only limited weight to his opinions. *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527(c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. Mar.

25, 2011) (same). Remand is not warranted on this issue.

    *2. Examiner*

    Plaintiff argues that substantial evidence does not support the ALJ's determination that Examiner's April 2017 consultative report was entitled to "partial weight". (doc. 14 at 25.) The Commissioner responds that the ALJ "carefully detailed" Examiner's findings and her reasoning, and that substantial evidence supports her analysis of his opinions. (doc. 22 at 24.)

    "An ALJ is not bound by any findings made by a non-treating medical source, such as a consultative medical examiner." *Sollien v. Colvin*, No. 3:13-CV-970-O, 2014 WL 1012515, at *3 (N.D. Tex. Mar. 14, 2014) (citing 20 C.F.R. § 404.1527(e)(2)(i)); *see Robinson v. Astrue*, 271 F. App'x 394, 396 (5th Cir. 2008) ("Wong performed a one-time consultative examination of Robinson and therefore is not due special deference as a treating physician."). She must consider such findings as opinion evidence and explain the weight given to such opinions in the written decision, however. *See* 20 C.F.R. §§ 416.927(e)(2)(i), 404.1527(e)(2)(ii).

    The ALJ considered Examiner's April 2017 consultative report and his findings that:

> [Plaintiff] reported disability due to neck, back and hip problems. Upon exam, there was no thyromegaly, thyroid nodule or mass appreciated. Cranial nerves were grossly intact. He had a symmetric, steady and slow gait, but he did not use an assistive device. Hand-eye coordination was good. Muscle strength was 5/5 in all areas tested. Cervical extension was slightly reduced at 50%, but the rest of his range of motion was unremarkable. [Plaintiff] was able to lift, carry and handle light objects. He was able to rise to a sitting position without assistance, and he had no difficulty getting up and down from the exam table. Lumbar spine x-rays showed mild degenerative disc disease. Hip x-rays showed mild degenerative changes, as well as right knee x-rays. [Examiner]'s impression was [Plaintiff] had a history of degenerative disc disease, status post fusion and revision surgery.

(doc. 9-1 at 21 (citing *id.* at 811-19.)) Examiner opined that Plaintiff could sit normally in an 8-hour workday with normal breaks, had "mild" limitations with standing and walking but did not need an assistive device, had "moderate" limitations with lifting and carrying weight, was unable to bend, stoop, crouch, or squat, but had no manipulative limitations on reaching, handling, feeling,

grasping, or fingering, and no relevant visual, communicative, or workplace environmental limitations. (*Id.* at 816.) The ALJ also considered Examiner's testimony at the September 2020 supplemental hearing:

> [Examiner] was currently working in hematology and oncology, but his board certification was [in] internal medicine. He did not keep copies of his consultative reports, and he did not remember examining [Plaintiff]. He did not usually evaluate orthopedic patients. At the time he examined [Plaintiff], he was contracted to provide a physical exam and form opinions of what [Plaintiff] could and could not do based on that exam. He reported that he did not request records as part of that position, but he would have noted any medical records, including imaging, that he reviewed, in his consultative report. He did not recall if he reviewed the x-rays taken at that time, but he did review x-rays in his current practice.

(*Id.* at 23-24; *see id.* at 54-62.)  She assigned "partial weight" to Examiner's consultative report because:

> [S]ome limitations [we]re appropriate and consistent with the medical evidence of record; however, [Examiner]'s assessment [wa]s not specific ([e.g.,] "moderate" [limitations]) and the physical examination had no specific abnormality other than gait. Furthermore, some of the limitations (inability to stoop, crouch and squat) appear[ed] to be based solely on reported pain without corresponding findings.

(*Id.* at 26 (citing *id.* at 811-19.))

Plaintiff first argues that the ALJ's finding that "some limitations" identified by Examiner were "appropriate" and "consistent" with the medical evidence of record is "unsupported by substantial evidence" because she failed to identify the limitations at issue and cite a "single" medical record contradicting Examiner's opinion, "leav[ing] this Court no basis for meaningful review". (doc. 14 at 26.) In finding that Examiner's opinions were "not specific", the ALJ referenced his use of the word "moderate" in his findings, e.g., Plaintiff had "*moderate* limitations" with lifting and carrying and "*moderate* difficulty" in rising from a squatting position. (doc. 9-1 at 26; *see id.* at 815-16.) She specifically noted that Examiner found Plaintiff had 5/5 muscle strength in all areas tested and "unremarkable" range of motion, but "slightly reduced" cervical extension at 50/60 and did not use an assistive device. (*Id.* at 21 (citing *id.* at 811-19.)) The ALJ also

considered that Plaintiff had 5/5 bilateral upper and lower extremity strength in June 2016, October 2016, and December 2016, and normal gait and range of motion in the spine in March 2017; in April 2017, he had a symmetric and steady gait, did not use an assistive device, and was able to rise from a sitting position without any assistance. (*Id.* at 20-21 (citing *id.* at 622-24, 648, 811-19, 915, 1020-22, 1026-28, 1043.)) Substantial evidence exists to overcome Examiner's medical opinions regarding Plaintiff's lifting, carrying, and squatting limitations, because medical records (including his own physical examination) show that Plaintiff had normal range of motion and 5/5 muscle strength, despite his abnormal tandem walk, slow gait, and inability to walk on his heels or toes or hop or stand on one foot at a time. (*See id.* at 811-19.) "The ALJ may accord [partial] weight to [Examiner]'s opinions because his own records contradict his opinions on Plaintiff's limitations." *Morgan v. Colvin*, No. 3:15-CV-2589-L (BH), 2016 WL 5369495, at *9 (N.D. Tex. Sept. 6, 2016), *report and recommendation adopted*, No. 3:15-CV-2589-L, 2016 WL 5341305 (N.D. Tex. Sept. 23, 2016) (finding the ALJ properly assigned "little weight" to the consultative examiner's opinion as to plaintiff's standing and walking limitations "because they were inconsistent with his own consultative examination report").

Plaintiff also argues that Examiner's consultative report is "inconsistent" with the ALJ's finding that his opinion on Plaintiff's inability to bend, stoop, crouch, and squat appeared to be based on subjective complaints rather than "corresponding findings". (doc. 14 at 26-27.) He points to Examiner's findings that he had slow gait, reduced 4/5 reflexes, abnormal tandem walk, and was unable to stand or hop on one foot at a time or walk on his heels or toes. (*Id.* (citing doc. 9-1 at 815.)) The consultative report does not connect these impairments to the alleged limitations, however. (*See* doc. 9-1 at 811-19; doc. 24 at 25-28.) Additionally, Examiner's report expressly noted that Plaintiff "*state[d]*" his neck, back, and right hip problems affected his ability to perform

"repetitive bending, stooping, [and] squatting" and then appeared to summarily conclude that he would not be able to perform them *at all* due to back pain. (doc. 9-1 at 811-19) (emphasis added). Plaintiff has not shown that the ALJ's finding as to Examiner's opinion on Plaintiff's inability to bend, stoop, crouch, and squat is "inconsistent" with the consultative report simply because Examiner found some impairments relating to Plaintiff's gait, reflexes, tandem walk, or ability to stand or hop on one foot at a time or walk on his heels or toes. *See Danzy v. Comm'r of Soc. Sec.*, No. SA-21-CV-00350-XR, 2022 WL 2063730, at *5 (W.D. Tex. June 8, 2022) ("Ultimately, [plaintiff] has the burden to prove her disability by establishing physical or mental impairment.") (citation omitted). Even if the ALJ's finding as to Examiner's opinions on Plaintiff's inability to perform these functions was "inconsistent" with the consultative report, she was not required to incorporate Examiner's limitations into the RFC. *See Hunt v. Astrue*, No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation."); *see also Walker v. Astrue*, No. 4:11-CV-680-A, 2011 WL 2989947, at *9 (N.D. Tex. June 1, 2011) ("[T]he ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record."), *adopted by* 2011 WL 2990691 (N.D. Tex. July 22, 2011). Moreover, "where [Examiner] is not [Plaintiff]'s treating physician and where [Examiner] examined [Plaintiff] only once", as here, "the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

The ALJ's reasons for assigning only "partial weight" to Examiner's opinions and disregarding his opinions about Plaintiff's inability to stoop, crouch, bend, or squat, combined with her review and analysis of the objective record, satisfy her duty under the regulations, and there is

substantial evidence to support the exclusion of Examiner's opinions that Plaintiff would not be able to bend, stoop, crouch, or squat. As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. A reviewing court must therefore defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. The ALJ properly considered Examiner's consultative report. Remand is not required on this issue.

### B.  <u>Duty to Develop</u>[22]

Plaintiff also argues that the ALJ failed to develop the record by not asking Examiner a "single" question at the supplemental hearing regarding his medical findings and functional conclusions, despite finding them to be "not specific", which prejudiced him. (doc. 14 at 27-28.) Had she sought clarification from Examiner when given an "obvious opportunity", he contends, "additional evidence might have led to a different RFC and a different decision". (*Id.* at 28.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton*, 209 F.3d at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, she does not have before her sufficient facts upon which to make an informed decision, and her decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill [her] duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012). The duty to obtain medical records generally belongs to the claimant, however. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins*, 2011 WL 1107205 at *7. Under the social security regulations, an ALJ is required to re-

---

[22] Although Plaintiff did not list this issue, he briefed it within the section relating to Examiner's opinions. (doc. 14 at 27.)

contact a medical source only "[w]hen the evidence ... from [the] treating physician or psychologist or other medical source is *inadequate* for [the Commissioner] to determine whether [the claimant is] disabled." *Cornett v. Astrue*, 261 F. App'x 644, 648 (5th Cir. 2008) (quoting 20 C.F.R. § 416.912(e)) (emphasis added).

As noted, Plaintiff's case was remanded by the Appeals Council in part because the prior ALJ failed to evaluate and weigh Examiner's consultative report. (doc. 9-1 at 158; *see id.* at 16, 49.) As noted, Examiner appeared at the supplemental hearing and was first examined by Plaintiff's counsel. (*Id.* at 55-62.) He testified that he did not recall examining Plaintiff in April 2017 and did not retain a copy of the consultative report because it was retained by the company for which he worked at the time. (*Id.* at 55-56.) He was board certified in internal medicine, at the time was in training in the areas of oncology and hematology and did not "normally" evaluate orthopedic patients for orthopedic problems. (*Id.* at 56.) He was in the practices of requesting any medical records or diagnostics relevant to the issue he was assessing and of including any of that information in the report. (*Id.* at 57-58.) After answering Plaintiff's counsel's last question, Examiner testified that he was out of time because he had patients waiting for him, and he was excused from the hearing before the ALJ could examine him. (*Id.* at 62.)

Plaintiff was represented by counsel at the hearing, so no "heightened duty to scrupulously and conscientiously explore all relevant facts" arose. *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see, e.g., Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel). As noted, while Examiner was excused from the supplementary hearing before the ALJ could examine him, he was not excused before Plaintiff's counsel appeared to indicate he had no further questions. (*See* doc. 9-1 at 62.)

42

Additionally, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. Although the ALJ determined that Examiner's consultative report contained opinions that were "not specific" and limitations that appeared to lack corresponding findings, (*see* doc. 9-1 at 26), there is no indication that she found the evidence in the record inconclusive or otherwise inadequate to render a decision, *see Mayes v. Massanari*, 276 F.3d 453, 459-60 (5th Cir. 2001) ("An ALJ's duty to develop the record further is triggered *only when* there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.") (emphasis added). For example, the ALJ considered the medical records from Pain Doctor, Back Doctor, Internist, and OT Clinic, as well as the opinions of Pain Doctor and the SAMCs. (*See* doc. 9-1 at 19-26.) There is also no indication that Examiner could have provided any additional information that would have been helpful to the ALJ. Accordingly, the ALJ did not have a duty to further develop the record by asking Examiner any question during the supplementary hearing. Remand is not required on this issue.

## C.  Separation of Powers

Plaintiff argues that two recent Supreme Court decisions—*Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), and *Collins v. Yellen*, 141 S. Ct. 1761 (2021)—mandate a finding that the statute governing the term and removal of the Commissioner of Social Security, 42 U.S.C. § 902(a)(3), violates the separation of powers. (doc. 14 at 28.) He further contends that because the Commissioner was appointed under an unconstitutional statutory provision, the ALJ at the time of the relevant agency action in his matter was also unconstitutionally appointed and did not have "proper authority" to render a decision on his claim, which warrants a "new hearing". (*Id.* at 31-32.) The Commissioner responds that this argument does not entitle him to a rehearing of his disability claim. (doc. 22 at 9.)

Removal of the Commissioner of the Social Security is governed by 41 U.S.C. § 902(a)(3). In *Seila Law LLC*, the Supreme Court held that the Consumer Financial Protection Bureau's removal statute, 12 U.S.C. § 5491(c)(3), which allowed for its director to be removed by the President of the United States only for "inefficiency, neglect of duty, or malfeasance of office," violated the separation of powers by insulating the director from removal by the President. 140 S. Ct. at 2197. In *Collins*, the Supreme Court held that a similar statute which limited the President to removing the director of the Federal Housing Finance Agency only for cause also violated the separation of powers. 141 S. Ct. at 1783 (noting that "*Seila Law* is all but dispositive").

The Commissioner concedes that § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause. (doc. 22 at 10) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)). She argues that setting aside an unfavorable disability benefits determination on this basis is not warranted, however, because *Collins* requires a showing by the plaintiff that the unconstitutional restriction "actually caused him harm." (*Id.* (citing 141 S. Ct. at 1787-89).)

"Applying *Collins*, district courts in this circuit and across the country have held that plaintiffs raising the same constitutional challenge to the prior Commissioner's final decisions 'must establish a "link" between the adverse action and the unconstitutional tenure-protection provision' to warrant relief on this basis." *Garza v. Kijakazi,* No. 3:21-CV-0826-M-BH, 2022 WL 2759849, at *10 (N.D. Tex. June 21, 2022), *report and recommendation adopted*, 2022 WL 2757629 (N.D. Tex. July 14, 2022)(citing *Hughes v. Kijakazi*, No. CV 20-2374, 2022 WL 1256704, at *21 (E.D. La. Mar. 9, 2022), *report and recommendation adopted*, No. CV 20-2374, 2022 WL 1238628 (E.D. La. Apr. 26, 2022); *Cooley v. Soc. Sec. Admin.*, No. CV 21-840, 2022

WL 1043693, at *7 (E.D. La. Feb. 4, 2022), *report and recommendation adopted*, No. CV 21-840, 2022 WL 1027144 (E.D. La. Apr. 6, 2022); *Harry E. B. v. Kijakazi*, No. 2:21-CV-00118-LEW, 2022 WL 669689, at *7 (D. Me. Mar. 6, 2022), *appeal docketed*, No. 22-35056 (9th Cir. Jan. 20, 2022)).

Although Plaintiff argues that the ALJ who decided his disability claim "did not have proper authority to render a decision on such claim", he does not identify an adverse action or argue that he even suffered a harm. (*See* docs. 14, 23.) To the extent that he argues that he was harmed by the ALJ's unconstitutional appointment, "[a] growing number of courts have found this argument is insufficient to establish the necessary link between the adverse action and the unconstitutional provision." *Garza*, 2022 WL 2759849, at *10 (citing *Hughes*, 2022 WL 1256704, at *21 ("[T]he court here finds that a vague reference to regulations issued by a commissioner subject to an unconstitutional removal provision is not enough to require remand."); *Sarah H. v. Comm'r of Soc. Sec.*, No. 3:21-CV-05149-JRC, 2021 WL 5770269, at *5 (W.D. Wash. Dec. 6, 2021) (claimant failed to show compensable harm under *Collins* when she failed to "identif[y] any new regulations, agency policies or directives [the prior] Commissioner [] installed that may have affected her claims"); *see also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) ("[T]here is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground.")). This Court has previously found this reasoning persuasive and adopted it. *See id.*

Without more, Plaintiff's general arguments are insufficient to show any link between the prior Commissioner's adverse decision in his case and the unconstitutional removal provision, and he has not otherwise shown that it "inflicted harm" on him. Remand is not required on this issue.

## IV.    RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 15th day of November, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE